Merchant Seamen Law pursuant to which a Maritime Declaration was held on board the vessel shortly after the alleged occurrence by the Swedish Consul in Boston, at which time a hearing was held of all persons who could give information and a report of the accident submitted by the Master; in accordance also with Swedish law a transcript of this hearing with exhibits was forwarded to the Swedish Board of Trade for appropriate action. Under the Accident Insurance Act of 1916 of Sweden, the shipowner is required to take out compensation insurance for the protection of seamen injured in the service of the ship. It does not appear that the libelant has made application for such compensation during all this time; although it does appear that any Swedish consul may entertain such application, hold a hearing and arrange for payment to the seaman of such amount as he may be found entitled to receive.

There is no reason for this court's retaining jurisdiction since the extent of libelant's recovery is determined and fixed by Swedish law which can adequately if not better be applied by the Swedish consul, Koziol v. The Fylgia, supra, and since there is a convenient forum available to libelant capable of fairly adjudicating his rights. The situation is completely different from that in The Fletero v. Arias, 4 Cir., 206 F.2d 267, relied upon by libelant; there, the accident took place in an American port and all the proofs connected with it were found there; had the Court declined to retain jurisdiction libelant would have been left in effect remediless as he would have had to travel to Argentina, where there were no proofs of the accident, and attempt there to recover against a ship owned by the Argentinian government. The inaccessibility of the forum alone was sufficient hardship to warrant retention of jurisdiction. Lauritzen v. Larsen, supra.

Motion granted; settle order.

**BIGLEY TRUCKING CORPORATION**
v.
**The UNITED STATES.**
No. 38–55.

United States Court of Claims.
March 6, 1957.

Raymond Gittelman, Washington, D. C., for plaintiff.

Alfred J. Kovell, Washington, D. C., with whom was Asst. Atty. Gen., George Cochran Doub, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

PER CURIAM.

This case was referred by the court, pursuant to Rule 45(c), Rules of Court of Claims, 28 U.S.C.A., to C. Murray Bernhardt, a commissioner of the court, with directions to make findings of fact, and recommendations for conclusions of law. The commissioner has done so in a report filed December 19, 1956. When more than 15 days elapsed after the filing of this report and neither party gave notice in writing of an intention to except to the commissioner's findings or recommendations, the defendant filed a motion for judgment in accordance with the recommendations of the commissioner. Since the court agrees with the recommendations and findings of the commissioner, as hereinafter set forth, it hereby adopts the same as the basis of its judgment in this case, and judgment will be entered for plaintiff in the amount of $38.40.

It is so ordered.

Opinion of the Commissioner

The plaintiff, Bigley Trucking Corporation, whose name itself adds confusion to the activities it shares with its closely affiliated and commonly owned sister organization, Bigley Brothers, Inc., sues to recover an unpaid balance on a contract with the Army to haul 300 creosoted wooden antenna pole sections from a railroad siding at La Plata, Maryland, to an open field within the reservation of the Army Remote Receiving Station, three miles distant from La Plata. The sum in suit represents amounts withheld by the Government for the value, less salvage, of three poles which were damaged in the course of plaintiff's transit operation.

In addition to defending on the ground of plaintiff's negligence, the Government contends that plaintiff is not entitled to sue because Bigley Brothers, Inc., actually performed the contract, and that plaintiff's liability as an insurer is fixed by the terms of the contract and by the contractor's status as a common carrier, which status plaintiff denies.

The 300 pole sections in question had been manufactured and tapered in matched pairs to that each pair would constitute, when spliced together, a single continuously tapered antenna pole 150 feet in length, the top section being about 60 feet in length, and the bottom section being about 90 feet and weighing approximately four tons. The sec-

tions were individually mated by being machined to fit at the spliced ends, and the sections of one pair were not interchangeable with sections of other pairs. They had been purchased by the defendant in Oregon and were consigned to the Army Remote Receiving Station, La Plata, Maryland, arriving at La Plata by rail at various times in January and February 1952.

On January 30, 1952, defendant's agent telephoned plaintiff and two other concerns he had selected from the classified section of the Washington, D. C., telephone directory and requested price quotations for removal of the poles from freight cars at La Plata and their hauling to and unloading at a selected site at the Remote Receiving Station. After Mr. Gilmartin, the Washington manager of the joint offices of plaintiff and Bigley Brothers, Inc., inspected the location to which the poles were to be hauled, he telephoned on the same day to defendant's agent a price quotation which the latter accepted as the low bid. The defendant's agent orally instructed plaintiff to proceed immediately in order to curtail demurrage, and stated that a purchase order numbered 166 would meanwhile be mailed to plaintiff. Plaintiff apparently had had title or no previous experience with Government contracts and, since Mr. Gilmartin had been given no further advice from defendant's agent as to the details of the contract other than the bare essentials related above, when the formal, signed purchase order arrived at plaintiff's office on February 4 incorporating by reference and attaching the standard General Provisions, these conditions constituted additions to the oral agreement, particularly paragraph 6 of the General Provisions reading as follows:

"Except as otherwise provided in this contract, (i) the Contractor shall be responsible for the supplies covered by this contract until they are delivered at the designated delivery point, regardless of the point of inspection; and (ii) the Contractor shall bear all risks as to rejected supplies after notice of rejection."

Upon receipt of the purchase order Mr. Gilmartin filed it away without question or demur.

Meanwhile, plaintiff proceeded with performance on January 31 as directed, using employees who were on the payroll of Bigley Brothers, Inc., a pole trailer and a low-bed trailer, each drawn by a tractor and owned by Bigley Brothers, Inc., and a truck-mounted crane and other loading equipment owned by Bigley Trucking Corporation. On February 2 a bottom pole section was damaged when, after being unloaded with other pole sections onto the trailer being operated by the contractor at the La Plata railroad siding, its spliced end was splintered when it was accidentally swung into the side of a freight car while being maneuvered through close quarters.

On February 5 the spliced end of another bottom pole section was splintered when it fell from the tractor end of the tractor trailer at the Army Remote Receiving Station. On this occasion the field on which the pole sections were to be unloaded was wet and muddy from rainfall the preceding day. The selected storage site was about 100 yards off of the reservation road, and so the contractor's loaded vehicles had to traverse the intervening stretch of open field to unload. After several loads had been successfully deposited, in crossing the field with another load the left rear wheel of the trailer fell into a muddy hole up to its axle. Plaintiff's employees then endeavored to extricate the mired vehicle with its load of pole sections by pulling it out with a truck attached to the front of the tractor. However, as the horizontal tension of the tow was applied a ¾″ steel safety cable, which besides the poles themselves was the sole connecting link between the tractor and the trailer, parted, and the ends of the pole sections resting on the rear end of the tractor fell four or five feet to the earth, splintering the spliced end of a pole section. Although plaintiff contended that the selection of the dumping site and mode of

extrication of the vehicle were dictated by defendant's agents so as to make defendant responsible, the evidence indicates plaintiff's concurrence in the former and defendant's mere acquiescence in the latter.

Either because plaintiff's employees objected to continued use of the site where the damage occurred, or because defendant desired to deposit the remaining poles elsewhere, another site was mutually agreed upon by the parties and activities resumed. Later on the same day, February 5, at the new site, the incident repeated itself and another bottom pole section was broken in half when it fell from the rear of the tractor as the result of the safety cable parting when a tow truck endeavored to extricate the trailer which had managed to get itself mired again.

The damage to the three pole sections not only made them unusable for their intended purpose, but also rendered useless the companion pole sections which the damaged sections were specially machined to fit. The contracting officer found plaintiff to be negligent and, in paying plaintiff for its services, withheld from the $3,600 contract price the sum of $1,732.40, representing the $2,111.40 cost price of the six sections rendered unusable, less their salvage value of $379. The Armed Services Board of Contract Appeals dismissed plaintiff's appeal for want of jurisdiction and the present suit was filed.

■ Both at common law and under sections 20(11) and 319 of title 49, U.S. C.A., a common carrier is liable as an insurer for the safety of property transported, save for damage resulting from an act of God or a public enemy, fault of the shipper, or inherent vice of the property itself. A private or contract carrier, to be distinguished from a common carrier by the latter's obligation to the public to carry on demand, is liable only to exercise ordinary care of the property carried, in the absence of a special contract provision fixing a greater degree of responsibility. In this respect the liability of a private or contract carrier is precisely that of a bailee for hire who must answer only for loss or injury resulting from failure to use ordinary care or, conversely, is responsible for ordinary negligence. Ordinary care is universally recognized to be such care as a prudent man would ordinarily give to the handling of his own property under like circumstances. Clark v. United States, 95 U.S. 539, 542, 24 L.Ed. 518; Atchison, Topeka & Santa Fe Railway Co. v. United States, 94 F.Supp. 677, 118 Ct.Cl. 194, 200; United States v. Savage Truck Line, 4 Cir., 209 F.2d 442, 44 A.L.R.2d 984.

Defendant has devoted considerable space to establishing that plaintiff's liability was that of an insurer, both because it was recognized as a common carrier by the Interstate Commerce Commission and, alternatively, the quoted provision of the written purchase order made it so. Although the evidence that plaintiff was, in fact, a common carrier, as well as that plaintiff was bound by the oral agreement and not by the written purchase order, is highly persuasive, neither of these matters need be decided, for the circumstances justify the legal conclusion that plaintiff was guilty of failure to exercise ordinary care which would prevent recovery in either event. For the same reason there can be passed over the question of whether Bigley Trucking Corporation or Bigley Brothers, Inc., was the proper party in interest, a subsidiary problem which the facts would seem to resolve in favor of plaintiff on the theory that an informal subcontract existed.

■ Application of the rule of ordinary care to the facts of the case results readily in defendant's favor as to the onus for each of the three damaged poles.

When the operator of plaintiff's apparatus at the railroad siding observed obstructions to the safe movement of his loaded trailer, ordinary prudence would have suggested either a temporary delay awaiting the dissipation or rearrangement of the obstacles to permit safe passage, or a nicer calculation of clearances. In proceeding he assumed a risk which

was realized when the end of his moving trailer brought the spliced end of a pole forcibly against the side of a freight car. It cannot be said that this passive obstacle was the proximate cause of the damage to the pole, or that the defendant was responsible for the existence of unloading conditions beyond its control. A freight depot during unloading operations is frequently a scene of orderly confusion, and care by operators of individual vehicles is the only effective preventative to damage to their cargoes. Reasonable care was not exercised in this instance.

 The plaintiff contends that defendant was negligent in not providing a safe place at the Army Remote Receiving Station for the poles to be deposited, and in directing the manner in which the mired trailer be extricated. These failures, says plaintiff, and not its own failure to employ the skill of its calling, were the approximate cause of the damage to the two poles on February 5. Before quoting a price plaintiff's agent inspected the site at the field where the poles were to be deposited, and did not object either to its distance from the access road or the nature of the terrain. After successfully using that site for several days, rain made the field muddy. In view of the exigencies of time existing, the election of plaintiff's employees to continue their unloading operations with the field in that condition was perhaps excusable. But their decision to pull the loaded tractor trailer out of a mudhole was not. Their knowledge of their equipment and its capabilities was necessarily superior to that of defendant's agents watching the operation. It required little imagination to expect that a ¾" steel cable would break under the lateral pressure of hauling a 24-plus ton load out of the mud, and to foresee the consequences of a broken cable. The cable was not designed or intended to withstand such strains. Even if defendant's agents had dictated the means employed, which is not the case, this would not exculpate plaintiff, for it was held in Hanaman v. Liberty Trucking Co., 243 Wis. 478, 11 N.W.2d 130, 149 A.L.R. 640, that the fact that the consignee's son and another helper furnished by the consignee assisted the driver of a truck in unloading goods did not exonerate the carrier from liability for negligence in the unloading, upon the theory that the consignee thereby consented to, and participated in, the conduct complained of. Having once experienced the disastrous consequences of hauling a heavily loaded tractor trailer out of the mud, there is less defense for the repetition of this incident several hours later, and correspondingly greater negligence on plaintiff's part. Due care by plaintiff's employees after the miring of the trailer in each instance would have led them to unload the poles before extricating the equipment. In neither of these incidents can it be said that defendant's failure to provide a safe site for unloading was the proximate cause of the damage. Plaintiff had not only approved the original site in advance, but also had used the field without event before rain created more hazardous conditions. Plaintiff could have foreseen before contracting the job that by the law of averages wet weather would be encountered during at least a portion of the performance and, if it felt insecure or uncertain, had several alternatives, including a refusal to bid. The condition of the unloading on February 5 was an accepted hazard over which defendant had no control.

Defendant properly withheld from its payment to plaintiff the cost of the damaged poles, less their salvage value. Since the cost of the poles was $2,111.40, and their salvage value was $417.40, instead of $379 as found by the contracting officer and paid to plaintiff (findings 10 and 11), plaintiff is entitled to judgment for the $38.40 balance.